BRASELTON CONSTRUCTION CO.
et al., Appellants,

v.

ANSLINGER, INC., et al., Appellees.

No. 785.

Court of Civil Appeals of Texas,
Corpus Christi.

Dec. 21, 1973.

Rehearing Denied Jan. 10, 1974.

Allen Wood, Wood, Burney, Nesbitt & Ryan, James R. Harris, Harris, Cook & Browning, Corpus Christi, for appellants.

Richard J. Hatch, Mahoney, Shaffer, Hatch & Layton, Corpus Christi, James I. Smith, Jr., Barrow, Bland & Rehmet, Houston, for appellees.

## OPINION

YOUNG, Justice.

This is a suit by subcontractors (cross-plaintiffs below, and appellees here) to recover for labor and materials supplied for the construction of the United States Post Office in Corpus Christi, Texas. Judgment non obstante veredicto was granted in favor of the claimant subcontractors. Appellants' fourteen points of error contend that the trial court erred in finding as a matter of law that the cross-plaintiffs furnished labor and materials in the amounts set out in the judgment non ob-

stante veredicto; that the court erred in not rendering judgment on the verdict; that the court erred in granting cross-plaintiffs' motion for judgment non obstante veredicto; and that the court erred in disregarding the jury's answers to special issues which inquired as to the reasonable market value of labor and materials provided by the cross-plaintiffs.

On or about June 22, 1968, Braselton Construction Co., (a defendant below and appellant here) entered into a contract for the construction of the United States Post Office in Corpus Christi. Pursuant to said contract, Braselton Construction Co., as principal, executed both a performance and material payment bond with The Insurance Co. of North America (a defendant below and also an appellant here; hereafter called I.N.A.). By contract dated September 12, 1968, Braselton Construction Co. entered into a subcontract with Godbe Mechanical Contractors (originally a defendant) to furnish all labor and material necessary to complete the job. Thereafter, Godbe Mechanical Contractors entered a contract with Thorpe Insulation Co. (the original plaintiff in the trial court) for the insulation work on the post office.

Work on the project commenced and Godbe proceeded with the performance of its subcontract until on or about May 1, 1969, at which time Godbe entered into a subcontract with Anslinger, Inc., the Gentry Co., and Robertson Sheet Metals, Inc. (all appellees here, but originally defendants and later cross-claimants in the trial court). Braselton was informed of this additional subcontract shortly after its execution. Pursuant to this subcontract, Anslinger, Inc. supplied labor and some materials necessary to complete the air conditioning work; the Gentry Co. supplied labor and some materials to complete the plumbing work; Robertson Sheet Metals, Inc., a wholly owned subsidiary of Anslinger, Inc., supplied labor and some materials necessary to complete the insulation of the project.

At the close of each month, Anslinger, Gentry and Robertson would submit their monthly billings for labor and material to Godbe who would pay them for such work. Godbe, in turn, would submit its monthly estimate to the general contractor, Braselton, who in turn, would pay the subcontractor, Godbe. Around October of 1969, Godbe encountered serious financial difficulties and failed to pay many of its subcontractors. Since no payment had been received by November 10, 1969, the three appellees advised Braselton of the nonpayment. On or about November 17, 1969, Braselton entered a written agreement with Godbe whereby Braselton took over the project. Under the terms of the agreement, Braselton agreed to complete the remaining work on the post office, release Godbe of all obligations under the contract, assume and pay all accounts of suppliers for materials previously furnished or to be furnished in the future, and to assume and pay to Anslinger and Gentry (and implicitly Robertson) all amounts then due and which might thereafter become due for labor previously performed, or to be performed, in accordance with the contract between Godbe, Anslinger, and Gentry which was effective May 1, 1969. The three appellees continuously supplied labor and material until early in December when they refused to supply additional labor and materials. On December 12, 1969, the three appellees gave their lien notices under the terms of the "Hardeman Act", Article 5452, Vernon's Ann.Civ.St.

On March 3, 1970, Thorpe Insulation Co. filed suit to recover for labor and materials furnished in the post office project naming as defendants Godbe, Braselton, I. N.A., Anslinger, Gentry, and the owners of the project. Anslinger, Gentry, and Robertson filed a cross-action on March 17, 1970, against Godbe, Braselton, I.N.A., and the Penner-Ring Co. (a partnership which originally owned the project). The case went to trial on June 5, 1972, and on June 28, 1972, the jury rendered its verdict in response to the submitted special issues.

In answer to the special issues, the jury found that each of the three appellees now before this Court, and Thorpe (during the pendency of this appeal the appellants reached a settlement with Thorpe; a joint motion to dismiss the appeal as to Thorpe was filed, and this Court granted the motion and ordered the dismissal of the appeal as to Thorpe in a per curiam opinion delivered July 31, 1973), had furnished labor and materials to Godbe which were used on the post office project in Corpus Christi. The jury found the reasonable market value of the labor and materials furnished by the three appellees during the months in question to be as summarized below (for the sake of comparison, the amount sued for is also set out):

| | MONTH LABOR & MATERIALS FURNISHED | AMOUNT SUED FOR | SPECIAL ISSUE # | JURY FINDING ON ISSUE |
|---|---|---|---|---|
| Gentry Company (appellee) | Sept. | 3902.04 | #36 | 2731.43 |
| | Oct. | 17998.55 | #38 | 12598.98 |
| | Nov. | 2606.90 | #40 | 1824.83 |
| | Dec. | 261.38 | #42 | 182.97 |
| Total | | 24768.87 | | 17338.21 |
| Attorney's Fees | | reasonable | #57 | 5000.00 |
| Anslinger, Inc. (appellee) | Oct. | 4475.66 | #44 | 3132.96 |
| | Nov. | 3760.32 | #46 | 2632.22 |
| | Dec. | 1268.53 | #48 | 887.97 |
| Total | | 9504.51 | | 6653.15 |
| Attorney's Fees | | reasonable | #60 | 5000.00 |
| Robertson Sheet Metals, Inc. (appellee) | Sept. | 1688.72 | #50 | 1182.10 |
| | Oct. | 17719.85 | #52 | 12403.89 |
| | Nov. | 6665.55 | #54 | 4665.89 |
| | Dec. | 300.44 | #56 | 210.31 |
| Total | | 26374.56 | | 18462.19 |
| Attorney's Fees | | reasonable | #63 | 5000.00 |

Following the rendition of the jury verdict, the appellees filed a motion for judgment non obstante veredicto, alleging that there was no evidence to support the jury's answers to the damage issues; that the amounts offered in evidence by each of the cross-plaintiffs was undisputed; and that the jury had arbitrarily reduced each of the amounts for the eleven months envolved by thirty (30%) per cent. Judgment non obstante veredicto was granted October 10, 1972, and the answers of the jury to the special issues inquiring as to the reasonable market value of the materi-al and labor, were set aside. The court also held that the amounts of cross-plaintiffs' claims were established as a matter of law. The defendants' motion for new trial was overruled and they now appeal to this Court.

A judgment notwithstanding a jury verdict can only be upheld on appeal when a directed verdict would have been proper. Rule 301, Texas Rules Civil Procedure; Villarreal v. Boggus Motor Company, 471 S.W.2d 615, 617 (Tex.Civ. App.—Corpus Christi 1971, n. r. e.). The

trial court may disregard only special issue jury findings which have no support in the evidence. Rule 301, T.R.C.P.; Villarreal v. Boggus Motor Company, supra. In order to sustain the action of the trial court in granting the motion for judgment non obstante veredicto, the appellate court must determine that there is no evidence on which the jury could have made the findings. In determining whether there is no evidence, all testimony must be considered in a light most favorable to the party against whom the motion is sought and every reasonable intendment deducible from the evidence is to be indulged in such party's favor. Leyva v. Pacheco, 163 Tex. 638, 358 S.W.2d 547, 550 (1962); Burt v. Lochausen, 151 Tex. 289, 249 S.W.2d 194, 199 (1952); Gentry v. Southern Pacific Company, 457 S.W.2d 889 (Tex.Sup.1970), affirming 449 S.W.2d 527 (Tex.Civ.App.— Corpus Christi 1969); Villarreal v. Boggus Motor Company, supra.

The question before this Court is whether the trial court was correct in holding that there was no evidence to support the jury's answers to the special issues as to the reasonable market value of the material and labor which were supplied.

■ Where judgment is rendered non obstante veredicto, an appellate court's statement of the evidence need only include that which supports the jury's verdict. Shelton v. Belknap, 155 Tex. 37, 282 S.W. 2d 682, 683 (1955); County of Calhoun v. Wilson, 425 S.W.2d 846, 852 (Tex.Civ.App. —Corpus Christi 1968, n. r. e.); Muro v. Houston Fire & Casualty Insurance Co., 329 S.W.2d 326 (Tex.Civ.App.—San Antonio 1959, n. r. e.). Here the reasonable market value of the material and labor which was supplied was sharply contested. There is conflicting testimony concerning the percentage of completion of the project at the time that the appellees entered into the subcontract with Godbe. There are also conflicts as to the number of men who were on the job each day and as to the proper allocation of overtime and travel time between the post office project and other projects on which Gentry was engaged. The conflicting evidence presented on these subjects bears heavily upon the quantity and reasonable market value of the labor and material which were supplied.

Morgan Speer Associates, Inc., entered into a contract with the United States Government for the architectural work on the post office project. Robert L. Koimn, an architect with Morgan Speer Associates, Inc., was the project manager on the post office project. Mr. Koimn testified on direct examination as follows:

"Q And can you describe for us generally what an architect does when he gets ready to build a building? What you go through to get a final set of plans and specifications.

A Well, depending on what type of building it is, you usually have a set of requirements that the owner has. These can be either well defined or very loosely defined. In the case of a federal building like the Post Office, they're very well defined. We had a very complete set of preliminary drawings that the Post Office staff people prepared themselves, and based on these we then did final designs and did what we call a set of working designs which the building is built from, being a set of specifications which control the materials, quantity and quality of workmanship, and then supervise or oversee the construction of the project to make sure it conforms to the documents we prepared.

*    *    *    *    *    *

Q In working for the United States Government on the Post Office, were you responsible at any time to go out there and check to see how much work had been performed or completed to date?

A Yes.

Q Did you do this task? Did you go out and inspect the building and

make certain reports in reference to the completion of that project?

A Yes.

Q And I believe I asked you to give us the percentage of completion on the mechanical portion of the United States Post Office for the month ending April 30, 1969.

A Yes.

Q Now, in your records, do you have such a percentage figure?

A Yes, I do.

\* \* \* \* \* \*

Q All right. Now, I want the percent for just the mechanical portion. And by the way, what is the mechanical portion of that contract? What would that involve?

A It's different on different jobs, but on the breakout we have on this job it includes the air conditioning and the plumbing.

Q All right. Now, the percent that was completed immediately prior to May 1st, '69, which would be the April 30th date. . . .

Q And what is that percent, sir?

A Sixty-seven percent.

Q All right. Now, again directing your attention just to the mechanical portion of the contract, what was the percent complete as of September 30th, 1969? . . .

A Ninety-eight percent.

Q All right. Now, is that the subcontractor's figure or is that your figure?

A That's the figure that we verify that's on the estimate that the general contractor submits to us for verification."

Hoyt Gentry, owner of appellee Gentry Plumbing Co., testified that in April 1969, he and Urban Anslinger had made an on-site inspection of the post office project in order to determine how much work had been done. According to Mr. Gentry, around twenty-five percent of the project had been completed at that time. Urban Anslinger testified that only twenty to twenty-five percent of the air conditioning and sheet metal work had been completed by May 1, 1969. The estimated percentage of completion at the time the appellees began work on May 1, 1969, thus varied from the sixty-seven percent which was the estimate of the United States Government's project manager, Mr. Robert L. Koimn, to the twenty to twenty-five percent estimated by the appellees. A jury could reasonably conclude from these conflicting estimates that the full amounts claimed by cross-claimants could not be justified in light of the amount of work remaining to be done.

Defendants' exhibit No. 30 consisted of daily job reports which were prepared by Braselton's timekeeper, Eloy Saldana, and approved by Mr. Noah Lee Holderfield, a Braselton superintendent on the post office job. Mr. Saldana testified that he obtained the information which he placed on the time sheets directly from the foreman for each particular craft. Braselton's daily job reports, along with records furnished by the appellees, were used to prepare defendants' Exhibits Nos. 33 and 34. Mr. Billy Braselton testified that defendants' Exhibit No. 33 was a recap of a comparison of the number of men shown to be on the job each day by the Braselton daily job reports and the number shown in the daily time cards of Robertson; he also testified that defendants' Exhibit No. 34 was a similar comparison using Braselton's daily job reports and the time cards of Anslinger and Gentry. Together, defendants' Exhibits Nos. 33 and 34 show significant differences between the number of appellees' men that Saldana reported to be on the job and the number reflected in the records of the appellees.

There is also evidence that a disproportionate amount of travel time and overtime may have been billed by Gentry. Bettie Wetherbee, office manager for Gentry, testified that Gentry employees would sometime spend part of a day working on a

Gentry job in Taft, Texas, and part of the same day working on the post office project in Corpus Christi. She testified that the determination of which job to charge for travel time was left up to the individual employee. She also testified that if a man worked overtime on a day that was split between the post office project and the Taft job, that it was then left up to the individual concerned to determine which of the jobs the overtime was to be charged.

█ The above testimony and exhibits when considered in the light most favorable to the appellants, and when all reasonable intendments deductible therefrom are indulged in the appellants' favor, constitute evidence in support of the jury's answers. We hold, therefore, that there is evidence from which a jury could reasonably conclude that the reasonable market value of the material and labor which were supplied by the appellees was less than the value which was asserted by the appellees. It is therefore ordered that the judgment of the trial court be reversed and judgment here rendered for the appellants in accordance with the jury verdict.

Reversed and rendered.